## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

**BEVERLY D. BURKETT**                                                                        **PLAINTIFF**

**v.**                                            **Case No.  5:11-cv-00170-KGB**

**THOMAS J. VILSACK, In His Official Capacity**
**as Secretary, U. S. DEPARTMENT OF AGRICULTURE**                    **DEFENDANT**

### OPINION AND ORDER

Plaintiff Beverly D. Burkett brings this action under 42 U.S.C. § 2000e, Title VII of the

Civil Rights Act of 1964, as amended.  Ms. Burkett alleges race discrimination and retaliation.

Ms. Burkett also brings this action under 28 U.S.C. § 2201 to declare the rights and other legal

relations between the parties.  On August 8, 2013, defendant Thomas J. Vilsack filed his motion

for summary judgment on Ms. Burkett's discrimination and retaliation claims (Dkt. No. 25).  On

August 25, 2013, Ms. Burkett filed her response in opposition to Mr. Vilsack's motion for

summary judgment (Dkt. No. 30).   For the reasons that follow, Mr. Vilsack's motion for

summary judgment is granted.

### I.        Factual Background

The following facts are undisputed unless stated otherwise.[1]  Ms. Burkett was employed

by the United States Department of Agriculture ("USDA" or "the agency") in a number of

different positions from March 2, 1987, until she was terminated on July 12, 2013.  Ms. Burkett

began her career as a temporary office clerk before receiving a permanent appointment on June

23, 1987, to the position of Program Assistant/Compliance, which was later renamed Program

---

[1]  The undisputed facts are taken from defendant's statement of uncontested facts (Dkt.
No. 26) and Ms. Burkett's response to defendant's statement of undisputed material facts (Dkt.
No. 31), unless otherwise noted by specific citation.

Technician (GS-7).  On July 27, 2003, Ms. Burkett was promoted to the County Operations Trainee (COT) program (CO-9).  On May 27, 2005, Ms. Burkett was placed in a Loan Specialist (Agriculture) position (GS-11).  Ms. Burkett's termination, which is the subject of a separate EEO Charge, is not before the Court and does not factor into the Court's decision in evaluating her claims here.  Ms. Burkett had a Master's Degree in Business Administration the entire time she worked for the agency.

During her time at the agency, Ms. Burkett filed eight EEO complaints against the agency.  She prevailed on three of those charges, receiving compensation and declarations that the agency had discriminated against her in its employment decisions.  Ms. Burkett brought her most recent EEO charge against the agency in September 2008, and it settled on July 31, 2009.

In December 2009, Ms. Burkett applied for the Agricultural Program Specialist and the Management and Program Analyst positions.  The Human Resource Office in Kansas City, Missouri, reviewed applications and selected applicants who were qualified for the positions and could be interviewed.  The Office found five employees qualified for the Agricultural Specialist position, and 11 employees qualified for the Management and Program Analyst position.  Ms. Burkett was included in both groups.  All of the qualified applicants were interviewed.

Linda Newkirk, the State Executive Director since 2009, was the selecting official for the positions.  Although not mandatory, Ms. Newkirk used an interview panel to fill the positions. The interview panel consisted of three Farm Service employees from other states: Margaret Ann Price, an Agriculture Program Specialist from Louisiana who is Caucasian; Emund Woods, a Management and Program Analyst from Mississippi who is African American; and Gerald Hrdina, a Conservationist Program Specialist from Missouri who is Caucasian.  None of the panelists were aware of Ms. Burkett's prior EEO activity.

Applicants interviewed for both positions at the same time, and the panelists asked all applicants the same questions.   Questions were provided to the panelists by Sharon Baker, Supervisory Agricultural Specialist, who would be the supervisor to the new Agricultural Program Specialist.   Miriam Morehead, Administrative Specialist (GS-12), reviewed and finalized the interview questions and sat in on the interviews to ensure proper procedure.  Ms. Morehead is African American.  Likewise, one of two EEO observers sat in on each interview, but neither reported irregularities.  Both EEO observers were African American.

On each question, each interview panelist scored the applicant's answer as high, medium, or low.  Three points were awarded for high answers, two points for medium, and one point for low.  The panelists worked with Ms. Morehead to establish score ranges for the high (70-79), medium (60-69), and low groups (less than 60).  Ms. Newkirk did not participate in establishing cut-off scores.

Ms. Burkett scored in the medium group for both positions.  Some Caucasian applicants were rated lower than Ms. Burkett by the interview panel, and one Caucasian male applicant with a Master's Degree in Business Administration scored lower than Ms. Burkett and was ranked in the medium group.  Ms. Newkirk made her selection for both positions from the applicants ranked in the high group, as is encouraged by the USDA Personnel Operations handbook, 3-PM, par. 92D.  In fact, if Ms. Newkirk had made her selection from outside the high group, she would have been required to submit a written explanation of her reasoning.    On February 12, 2010, Ms. Newkirk selected Lamar Rolland, who is Hispanic, for the Agricultural Specialist position (Dkt. No. 1, at 10).  Two applicants ranked in the high group: Rhonda Little with a score of 74 and Ms. Rolland with a score of 71.[2]  Ms. Newkirk first offered the position to

---

[2]  Ms. Rolland's score should have been 72 but was not due to a mathematical error.

Ms. Little, who turned it down, and then to Ms. Rolland.  Ms. Rolland had 26 years of service with the agency, having worked in the farm program since 1984, and had extensive training on the National Farm Bill.  Ms. Rolland only had a high school education.

On February 16, 2010, Ms. Newkirk selected Marilyn Sue Harmon, who is Caucasian, for the Management and Program Analyst position (Dkt. No. 1, at 10).  Three applicants ranked in the high group: Ms. Little with a score of 74; Ms. Rolland with a score of 73; and Ms. Harmon with a score of 70.   Ms. Harmon had 24 years of service with the agency in one of the largest counties in the state, with 15 years at the Price Support Division.  Ms. Harmon only had a high school education.

On February 16, 2010, Ms. Burkett's supervisor Vanessa Moore, who is African American, gave Ms. Burkett a performance appraisal summary rating of "fully successful" and "meets fully successful" for each of her five performance elements for fiscal year 2009 (Dkt. No. 27, at 8).  Ms. Moore had given Ms. Burkett the same performance summary rating of "fully successful" the previous two years.  As for the five performance elements, Ms. Moore had given Ms. Burkett four "meets fully successful" and one "exceeds fully successful" for 2008, and three "meets fully successful" and one "exceeds fully successful" for 2007.   Parties agree that Ms. Burkett's performance appraisal for fiscal year 2009 played no role in her non-selection for the Agriculture Program Specialist and Management and Program Analyst positions, as it was given to Ms. Burkett after her non-selection.

On March 10, 2010, Ms. Burkett contacted the USDA's Office of Adjudication, which issued a Notice of Right to File on April 24, 2010 (Dkt. No. 1, at 10-11).  The agency accepted and referred Ms. Burkett's complaint for investigation on July 2, 2010 (*Id.*).  Ms. Burkett's non-selection for the Agricultural Program Specialist and Management and Program Analyst

positions and her fiscal year 2009 performance appraisal were investigated.  On April 5, 2011, the agency issued a final agency decision, finding no discrimination (*Id.*).  Ms. Burkett then brought her claims before this Court.  On August 8, 2013, Mr. Vilsack on behalf of the agency filed a motion for summary judgment on Ms. Burkett's discrimination and retaliation claims (Dkt. No. 25).  On August 25, 2013, Ms. Burkett filed her response in opposition to Mr. Vilsack's motion for summary judgment (Dkt. No. 30).  For the reasons below, the Court grants Mr. Vilsack's motion for summary judgment.

## II.       Standard of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56;  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Hollway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010) (quoting *Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir. 1999)) (citing *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006))). "Because summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed." *Id.* Accordingly, this Court applies the same summary judgment standard to discrimination cases as it does to all others.

### III.      Title VII Claims

Ms. Burkett can establish a *prima facie* claim of race discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012). Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. *Torgerson*, 643 F.3d at 1043-44 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Therefore, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. *Id.* A plaintiff with strong direct evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, irrespective of whether his strong evidence is circumstantial. *Id.* However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the

requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.* (quoting *Griffith*, 387 F.3d at 736).

## A.  Direct Evidence Analysis

"To be entitled to direct evidence analysis, the plaintiff must present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998) (internal quotation marks omitted).   Ms. Burkett has presented no direct evidence of discrimination.   Accordingly, the Court will proceed through the *McDonnell Douglas* analysis for Ms. Burkett's claims.

## B.  *McDonnell Douglas* Analysis

Under the *McDonnell Douglas* analysis, "the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007).   If a plaintiff makes out a *prima facie* case, she creates a presumption of unlawful discrimination, and the burden shifts to the defendant to come forward with evidence of a legitimate nondiscriminatory reason for its actions.   *Id*.   "If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual." *Id.*

### 1.  Race Discrimination

Ms. Burkett alleges a failure-to-hire claim by asserting that the USDA denied her the Agricultural Program Specialist and Management and Program Analyst positions.   "A plaintiff establishes a *prima facie* case in a 'failure to hire' case when he proves that (1) he is a member of a protected class; (2) he was qualified for the position for which the employer was accepting

applications; (3) he was denied the position; and (4) the employer hired someone from outside the protected class." *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006) (citing *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 702 (8th Cir. 1994)).

### i.        *Prima Facie* Case

Mr. Vilsack asserts that Ms. Burkett cannot make out a *prima facie* case of race discrimination regarding her non-selection for the Agricultural Program Specialist position because the fourth element is not met.  Ms. Newkirk selected Ms. Rolland for this position; Ms. Rolland is Hispanic and, Mr. Vilsack argues, a member of a protected class. *See Carlisle v. St. Charles Cmty. Coll.*, 2010 WL 1438817, at *8 (E.D. Mo. 2010).  Plaintiff did not respond to this argument in its reply.  For this reason, and for the reasons that follow, Mr. Vilsack is entitled to summary judgment on Ms. Burkett's claim of race discrimination regarding her non-selection for the Agricultural Program Specialist position.

Mr. Vilsack admits that Ms. Burkett can establish a *prima facie* case of race discrimination in regard to her non-selection for the Management and Program Analyst position. This is because Ms. Burkett is a member of a protected class, was qualified for the position, was denied the position, and the employer hired someone from outside the protected class—Ms. Harmon, who is Caucasian.

### ii.        Legitimate Nondiscriminatory Reason

Because Ms. Burkett has established a *prima facie* case of race discrimination regarding her non-selection for the Management and Program Analyst position, the burden shifts to defendant to produce evidence of a legitimate nondiscriminatory reason for its actions. *McGinnis*, 496 F.3d at 873.  While the Court finds that Ms. Burkett did not establish a *prima facie* case of race discrimination regarding her non-selection for the Agricultural Program

Specialist position, the Court will analyze the remaining steps of the *McDonnell Douglas* analysis for that position as well.

Defendant's burden to demonstrate that it did not hire Ms. Burkett for a legitimate, nondiscriminatory reason "is not onerous." *Bone*, 686 F.3d at 954. Courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Id.* at 955 (internal quotation marks omitted). Defendant need only proffer a good-faith reason for its action. *Id.*

Here, Mr. Vilsack produces a legitimate nondiscriminatory reason for the agency's actions, namely that Ms. Newkirk followed the USDA Personnel Operations handbook, 3-PM, par. 92D, by selecting from the candidates whose interview scored within the high group. Moreover, if Ms. Newkirk had not selected from the highest group, she would have been required to submit a written justification before the final decision. Because Ms. Burkett's interview score did not fall within the high group while Ms. Rolland and Ms. Harmon's interview scores did, Ms. Newkirk had a legitimate nondiscriminatory reason not to hire Ms. Burkett for the positions.

### iii.     Pretext For Discrimination

Because Mr. Vilsack has carried the burden of articulating a legitimate, nondiscriminatory reason not to hire Ms. Burkett for these positions, the burden shifts to Ms. Burkett to demonstrate pretext. *McGinnis*, 496 F.3d at 873. "There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." *Torgerson*, 643 F.3d at 1047. First, "[a] plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the

court that a [prohibited] reason more likely motivated the employer." *Id.* (alterations in original) (citations omitted) (internal quotation marks omitted).   In this sense, Ms. Burkett's burden of establishing pretext "merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination." *Id.* at 1046 (internal quotation marks omitted).

As evidence of pretext, Ms. Burkett makes three arguments: that the interview process was subjective, that the agency has a history of discrimination, and that the defendant changed its position regarding the reason Ms. Burkett was not hired for the positions.  The Court will address each argument in turn.

First, Ms. Burkett offers as evidence of pretext that the interview process used by the defendant was subjective.  The Eighth Circuit has held that, "An employer's asserted reliance on subjective factors . . . particularly is to be closely scrutinized for discriminatory abuse." *O'Conner v. Peru State Coll.*, 781 F.2d 632, 637-38 (8th Cir. 1982).   "When the evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and undiscriminatory basis of the articulated reason for the decision should be subject to particularly close scrutiny . . . ." *Coble v. Hot Springs Sch. Dist. No. 6*, 682 F.2d 721, 726-27 (8th Cir. 1982) (quoting *Royal v. Mo. Highway & Transp. Comm'n*, 655 F.2d 159, 164 (8th Cir. 1981) (citations omitted)).  However, "[b]y nature, most interviewing involves a degree of subjectivity and judgment which is important to the selection process." *Mustafa v. State of Neb. Dep't of Corr. Servs.*, 196 F. Supp. 2d 945, 952 (D. Neb. 2002) (citing *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1178 (10th Cir. 2000) (Magill, J., sitting by designation); *Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000) (noting that "subjective evaluations of a job candidate are often critical to the decisionmaking process . . . .").

Initially, it is not clear that particularly close scrutiny is required here, as many of those in charge of and involved in the selection process were members of the protected minority.  *See Coble*, 682 F.2d at 727-28 (ruling that particularly close scrutiny is only required where "the evaluation is in any degree subjective *and when the evaluators themselves are not members of the protected minority*" (emphasis added)).   One of the panelists, Mr. Woods, is African American.  His scores of Ms. Burkett's answers were aggregated with the other two panelists' scores to put her in the medium range.  Further, Ms. Morehead, who is African American, met with all of the panelists to establish the score ranges, reviewed and finalized the interview questions, and sat in on each interview to ensure proper procedure was followed.  Lastly, one of two EEO observers, both of whom are African American, sat in on each interview to report any irregularities, but they found none to report.

Regardless, even with close scrutiny and viewing all facts in favor of Ms. Burkett, the Court determines the selection process used by the agency was legitimate and nondiscriminatory. The Human Resource Office in Kansas City, Missouri, reviewed applications and selected applicants who were qualified for the positions and could be interviewed.   The interview panelists were diverse and experienced agency employees, and two held the jobs for which they were conducting interviews.  All panelists were from out of state, and none knew the applicants. The panelists asked all applicants the same questions, individually scored the applicants, and did not discuss the scores among themselves.  Both Ms. Morehead and an EEO observer monitored each interview.  Ms. Newkirk, the selecting official, did not participate in the interview process or discuss the applicants with the panelists, and she did not participate in setting the score ranges. Pursuant to the agency's Personnel Operations handbook, Ms. Newkirk selected from the applicants whose interviews scored in the high group.  District courts facing similar facts have

granted summary judgment.  *See Childs v. Omaha Pub. Power Dist.*, 2007 WL 3342716 (D. Neb. Nov. 6, 2007) (granting summary judgment where applicants were interviewed by an interview panel and the applicant with the highest score was hired); *Rice v. Snow*, 2006 WL 931922 (W.D. Mo. Apr. 11, 2006) (granting summary judgment because plaintiff could not show pretext where IRS selected the applicant based on interview scores); *Grant v. City of Cedar Rapids*, 2000 WL 34030832 (N.D. Iowa Dec. 1, 2000) (granting summary judgment because plaintiff could not show pretext where her interview did not score among the top applicants).

Second, Ms. Burkett offers as evidence of pretext that the agency has a history of discrimination.  Ms. Burkett first cites two cases for the proposition that a history of past discrimination requires the Court to employ "heightened scrutiny" when investigating a defendant's articulated nondiscriminatory reason.  In *Thurman v. Yellow Freight Systems, Inc.*, the defendant Yellow Freight was under a consent decree setting a 33% minority-hiring goal, which it had failed to meet the prior two years even though qualified African Americans were available to hire.  90 F.3d 1160, 1167 (6th Cir. 1996).  In *Chang v. University of Rhode Island*, the defendant University failed to adopt or implement effectively an affirmative action plan and left decision makers with a history of bias in place.  606 F. Supp. 1161, 1183-84 (D. RI 1985). In both cases, the courts held that such facts required heightened scrutiny.

To show the agency's history of discrimination, Ms. Burkett first offers her own litigation history with the USDA and then statistical data on the agency's farm loan program and employment practices.  Ms. Burkett has filed eight EEO complaints against the agency during her employment. She prevailed on three of those, receiving compensation and declarations that the agency had discriminated against her (Dkt. No. 32, at 29-31).  A fourth case brought by Ms. Burkett against the agency settled (*Id.* at 32).  Ms. Burkett next cites statistical data, taken from

the Arkansas State Management Review dated April 4-7, 2006, as proof of the Farm Service Agency's history of discrimination.   As of 2006, she notes that of the 209 District Directors, Supervisory Loan Specialists, County Executive Directors, and Program Technicians, ten, or 5%, were African American.   Of the five District Directors, all were Caucasian men.   Of the 13 Supervisory Loan Specialists, two, or 15%, were African American.   Of 48 County Executive Directors, three, or 6%, were African American.   Of 143 Program Technicians, seven, or 5%, were African American.   Of the 307 permanent employees of Arkansas USDA-FSA, 37, or 12%, were minorities.   Ms. Burkett also claims that the State Management Review ultimately determined that, as she puts it, "Arkansas was not doing a good job in providing employment opportunities for its African-American employees" (*Id.* at 36).

Mr. Vilsack argues that the facts here are distinguishable from the two cases cited by Ms. Burkett, *Thurman* and *Chang*, and thus heightened scrutiny is not required.   The Court agrees.   In *Thurman*, defendant Yellow Freight was violating a consent decree requiring it to meet a 33% minority-hiring goal, despite its opportunity to comply.   The agency is not bound by or violating any such consent decree here.   Ms. Burkett cites *Pigford v. Glickman*, a nationwide class action lawsuit in which African American farmers were awarded a monetary consent decree after arguing that they were not afforded equal access to USDA-FSA programs as Caucasian farmers. 185 F.R.D. 82 (D.D.C. 1999).   However, *Thurman* involved the actual violation of a minority-hiring goal.   90 F.3d at 1167.   Conversely, the agency has not violated the *Pigford* consent decree, which involved only compensation for lack of access to farm loans, not employee hiring.

In *Chang*, a class action based on employment discrimination had been brought against defendant, who continued to employ decision makers with a history of bias.   606 F. Supp. at 1183-84.   Here, no class action has been brought against the agency based on its employment

practices, and the selecting official, Ms. Newkirk, was newly appointed as State Executive Director in 2009.  Ms. Burkett argues that Ms. Newkirk's hiring decisions since becoming Executive Director show a tendency of passing over more qualified minorities.  Mr. Vilsack counters that, since 2009, three of the seven employees Ms. Newkirk has promoted have been minorities,[3] while four of the seven employees she has hired have been minorities (Dkt. No. 33, at 9).  For the two positions at issue in this case, Ms. Newkirk hired one minority—Ms. Rolland, who is Hispanic.  Accordingly, the Court finds that based on these facts Ms. Newkirk does not have a history of discrimination, and the Court will not apply heightened scrutiny.  However, the Court must now consider whether under normal scrutiny Ms. Burkett's statistical evidence of the agency's history of discrimination constitutes pretext.

"[T]he obligation imposed by Title VII is to provide an equal opportunity for *each* applicant . . . without regard to whether members of the applicant's race [or age group] are . . . proportionally represented."  *Bell v. Bolger*, 708 F.2d 1312, 1318 (8th Cir. 1983) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579 (1978)) (alterations in original) (internal quotation marks omitted).  Statistics can be useful in determining whether a proffered reason is pretextual but must evaluate the treatment of comparable employees to be meaningful indicators of pretext.  *Roxas v. Presentation Coll.*, 90 F.3d 310, 316-17 (8th Cir. 1996); *Schultz v. McDonnel Douglas Corp.*, 105 F.3d 1258, 1259 (8th Cir. 1997).  "When different decision makers are involved, two decisions are rarely similarly situated in all relevant aspects."  *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 718 (8th Cir. 2012) (internal quotation marks omitted).  Accordingly, courts have found that company or industry wide statistics are usually not helpful

---

[3] Ms. Burkett claims that one of Ms. Newkirk's minority promotions, Larry Segars, should not be counted because, although Ms. Burkett admits he is Native American, "one would just assume he is Caucasian by his appearance."  However, the Court will count based on actual race, not subjective appearance.

in showing pretext because those who make employment decisions vary. *See Carman v. McDonnell Douglas Corp.*, 114 F.3d 790, 792 (8th Cir. 1997); *Axtell v. Northwest Airlines, Inc.*, 1999 WL 33912056, at *7 (D. Minn. June 30, 1999).

Ms. Burkett's statistical data on the agency's farm loan practices and agency-wide employment figures does not show pretext because it is irrelevant. The statistical data on farm loan practices does not evaluate the treatment of comparable employees, as it is not even related to the agency's employment practices, and, therefore, is not a meaningful indicator of pretext. *See Roxas*, 90 F.3d 316–17; *Schultz*, 105 F.3d at 1259. Likewise, the statistical data on employment figures is found in a 2006 report, but Ms. Newkirk did not become a hiring official until 2009. Accordingly, the statistical data involves different decision makers and, therefore, is not a meaningful indicator of pretext. *See Onyiah*, 684 F.3d at 718; *Carman*, 114 F.3d at 792; *Roxas*, 90 F.3d 316–17; *Axtell*, 1999 WL 33912056, at *7. Further, even if Ms. Burkett's agency-wide statistical data is relevant, the agency argues that it does not show a history of discrimination. The Court agrees. The 2006 report merely encouraged the agency to "continue efforts to seek qualified minority men and women and persons with disabilities as candidates to fill permanent, temporary, and intermittent positions" (Dkt. No. 33-1, at 16).

Only Ms. Newkirk's hiring history is relevant to Ms. Burkett's Title VII claim and, as discussed above, Ms. Newkirk does not have a history of discrimination. Because Ms. Newkirk provided Ms. Burkett with an equal opportunity in applying for the two positions in question, as discussed above, the agency has met its Title VII obligation to Ms. Burkett; statistical data that purports to show an agency-wide deficiency in the proportional representation and treatment of minorities does not change that. *See Bell*, 708 F.2d at 1318.

Third, Ms. Burkett offers as evidence of pretext that Ms. Newkirk purportedly changed her reasons for not selecting Ms. Burkett for the Agriculture Program Specialist and Management and Program Analyst position.  "An employer's changing rationale for making an adverse employment decision can be evidence of pretext."  *Thurman*, 90 F.3d at 1167 (citing *Edwards v. U.S. Postal Serv.*, 909 F.2d 320, 324 (8th Cir. 1990); *Schmitz v. St. Regis Paper Co.*, 811 F.2d 131, 132-33 (2d Cir. 1987)).  "Evidence of a changing hiring process and fluid standards for applicants, taken together with the defendant's evolving explanation of its hiring decision, would allow a reasonable jury to infer that the County's explanation is a pretext for unlawful discrimination."  *Peterson v. Scott Cnty.*, 406 F.3d 515, 522 (8th Cir. 2005) (citing *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1110 (8th Cir. 1994)), *abrogated on other grounds by Torgerson*, 643 F.3d 1031.

In her deposition, Ms. Newkirk was asked the following question: "Is there any reason the Complainant was not selected other than her score in the interview?" (Dkt. No. 33, at 16).  Ms. Newkirk answered "No." (*Id.*, at 16).  In Ms. Burkett's interrogatories and request for production of documents, the agency was asked the following question: "Please state with specificity the reasons why Marilyn S. Harmon was selected for the Management and Program Analyst (COR) position as opposed to Beverly Burkett." (*Id.*, at 16).  The agency answered, "Linda Newkirk made the selection from the three candidates who the panel had rated in the highest group. Beverly Burkett was rated in the middle group." (*Id.*, at 16).  The agency went on to explain the reasons for hiring Ms. Harmon:

> Linda Newkirk selected Sue Harmon because she had 24 years of continuous service in the farm program area of one of the largest counties in the State, and had been trained on the 2008 Farm Bill. She had worked 15 years straight with the Price Support Division as well as being responsible for all administrative functions and did purchasing and reconciling payments for the 8 counties in the district. She had worked in all programs of the farm program division during her

> 25 years. She had conducted training in the district including attendees from FSA, NRCS & RD for e-authorization, and she had developed instruction guides for the training. She had also developed price support forms to document eligibility before automated reports were available. She had also developed a Query that automatically processed maturity letters to producers and another that created payment limitation letters. These were used by all counties in the district.

(Dkt. No. 32, at 42).   The same question was asked regarding Ms. Rolland, and the agency provided a similar answer explaining Ms. Rolland's qualifications that again was prefaced with the explanation that Ms. Newkirk selected from the highest group (*Id.*).

The agency argues that its answers do not show pretext because it did not change position.  The Court agrees.  The questions upon which Ms. Burkett attempts to rely to establish a change in position ask two different questions.  In her deposition, Ms. Newkirk was asked if there was any other reason for not selecting Ms. Burkett besides her interview score.  Ms. Newkirk answered no because she did not consider any applicant who did not score in the high group.  In Ms. Burkett's interrogatories and request for production of documents, she asked the agency to explain why Ms. Harmon and Ms. Rolland were selected over Ms. Burkett.  The agency provided the same answer for why Ms. Burkett was not hired as Ms. Newkirk did in her deposition (because "Beverly Burkett was rated in the middle group") but then went on to explain why Ms. Harmon and Ms. Rolland were selected from the applicants who did score in the high group.  Accordingly, the Court finds no inconsistency in the agency's answers.

Therefore, for the reasons stated above, the Court grants Mr. Vilsack's motion for summary judgment as to Ms. Burkett's race discrimination claim regarding her non-selection for the Agriculture Program Specialist and Management and Program Analyst position.

## 2.      Retaliation

Ms. Burkett also brings a retaliation claim.   "To establish a *prima facie* case of retaliation, an employee has the initial burden of establishing retaliation by showing that (1) she

engaged in protected conduct; (2) she suffered a materially adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 2013 WL 4529461, at *2 (8th Cir. Aug. 28, 2013) (citing *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011)).   "Further, retaliation must be the 'but for' cause of the adverse employment action." *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)).

> a.   **Agricultural Program Specialist Positions And Management And Program Analyst Positions**

Ms. Burkett cannot establish a *prima facie* case of retaliation in regard to her non-selection for the Agricultural Program Specialist and Management and Program Analyst positions because the third element, a "but for" causal link between the adverse action and the protected conduct, is not met.

Generally, more than temporal connection is required to establish a causal connection. *Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011).   "As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation . . . ." *Id.*   "The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." *Id.*; *see, e.g.*, *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 645 (8th Cir. 2009) (holding that gap of seven months was not sufficiently contemporaneous to indicate a causal connection); *Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008) (holding that gap of six months was insufficient); *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1044-45 (8th Cir. 2007) (holding that gap of six months was insufficient).   In fact, the Eighth Circuit has determined that a gap as short as two months did not establish a causal connection, *see, e.g.*, *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616 (8th Cir.

2003) ("[W]e conclude that the time interval of more than two months is too long to support an inference of causation."); *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002), and that a two-week interval was "sufficient, but barely so," *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

Here, Ms. Burkett filed her last EEO complaint in September 2008, months before her non-selection for the two positions. Ms. Burkett's non-selection for the two positions occurred in February 2010, one year and five months later. Even if the Court measures from when Ms. Burkett's EEO case settled on July 31, 2009, the protected conduct still occurred over six months before her non-selection. When compared to the Eighth Circuit's previous cases holding a time interval of two months to be insufficient, it is clear that the time interval found here—of either six months or one year and five months, depending on where the Court starts the timer—leads to at least a weakened or perhaps a nonexistent inference of retaliation. *See Kipp*, 280 F.3d at 897; *Trammel*, 345 F.3d 611.

Further, there is no alternate evidence from which a reasonable jury could overcome this weakened inference to find a causal connection. Although Ms. Newkirk, who made the final selection from the applicants who scored in the high range, knew of Ms. Burkett's prior EEO activity, she was not named or involved in the prior EEO complaint and did not become State Executive Director until after Ms. Burkett's prior EEO complaint was resolved. Ms. Newkirk also did not participate in conducting the interviews or in establishing the score ranges and maintains that Ms. Burkett's prior EEO activity was not a factor in her non-selection. Further, the panelists who established the score ranges along with Ms. Morehead and scored Ms. Burkett's interview in the medium range were not aware of Ms. Burkett's prior EEO activity.

For the reasons above, the agency is entitled to summary judgment on Ms. Burkett's claim of retaliation regarding her non-selection for the Agricultural Program Specialist and Management and Program Analyst position.

### b.      Fiscal Year 2009 Performance Appraisal

Ms. Burkett also cannot establish a *prima facie* case of retaliation regarding her fiscal year 2009 performance appraisal because both the second and third elements are not met.  For the reasons stated above, there is no "but for" causal link between the protected conduct and the adverse action.  Ms. Burkett filed her last EEO complaint in September 2008, and her fiscal year 2009 performance appraisal was given in February 2010, making the time interval one year and five months.  Therefore, no "but for" causal link has been established.  *See Kipp*, 280 F.3d at 897; *Trammel*, 345 F.3d 611.

Moreover, Ms. Burkett's fiscal year 2009 performance appraisal does not constitute and did not lead to a materially adverse employment action.  "[T]o be materially adverse, retaliation cannot be trivial; it must produce some injury or harm."  *Littleton*, 568 F.3d at 644 (internal quotation marks omitted).  "A lower satisfactory evaluation, by itself, does not provide material alteration of [plaintiff's] employment and is not actionable."  *Sutherland v. Mo. Dep't. of Corr.*, 580 F.3d 748, 752 (8th Cir. 2009).  This is because "[a]n unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment."  *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 927 (8th Cir. 2007) (alteration in original) (internal quotation marks omitted).  "Performance ratings that have a negative impact on promotion potential do not constitute an adverse employment action unless the rating actually led to a denial of the promotion."  *Turner v. Gonzales*, 421 F.3d 688, 696 (8th Cir. 2005); *see also Walker v. Ark. Dep't of Corr.*, 2008 WL

2705567, at *3 (E.D. Ark. July 9, 2008) (employee failed to show that she would have received promotion absent fair performance evaluation).

The agency first argues that Ms. Burkett's fiscal year 2009 performance appraisal was not actually lower.  For fiscal years 2007, 2008, and 2009, Ms. Burkett received the same summary rating—"fully successful."  For both 2007 and 2008, she received an "exceeds fully successful" for one performance element and a "meets fully successful" for the rest.  For 2009, she received all "meets fully successful" on her performance elements and no "exceeds fully successful."

Even if the Court considers this slight change in Ms. Burkett's performance appraisal as "lower," a lower performance appraisal by itself in not a materially adverse employment action. *See Sutherland*, 580 F.3d at 752.  Further, there is no evidence that Ms. Burkett's fiscal year 2009 performance appraisal led to a materially adverse employment action.  *See Turner*, 421 F.3d at 696.  Both parties agree that Ms. Burkett's fiscal year 2009 performance appraisal played no role in her non-selection for the Agricultural Program Specialist and the Management and Program Analyst positions, as the performance appraisal was given to Ms. Burkett after her non-selection.  Even if Ms. Burkett had received her 2009 performance appraisal and included it in those applications, Ms. Burkett's interview still would not have scored within the high range from which Ms. Newkirk made her final selection.  Lastly, as mentioned above, the mere potential of a performance rating having a negative impact on future promotability is not sufficient to constitute a materially adverse employment action.  *See id.*; *Walker*, 2008 WL 27005567, at *3.

For these reasons, the agency is entitled to summary judgment on Ms. Burkett's claim of retaliation regarding her performance appraisal.

### IV.     42 U.S.C. § 1983 Claims

Ms. Burkett also brings a 42 U.S.C. § 1983 claim in her response to Mr. Vilsack's motion for summary judgment.  Mr. Vilsack points out that Ms. Burkett did not raise a § 1983 claim in her complaint and that the deadline for amending pleadings has passed.  For these reasons, the Court will not consider this claim.  Further, even if the claim was properly before the Court, it is not valid here.  "Only state actors can be held liable under Section 1983."  *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  No state officials are involved in the alleged discrimination against Ms. Burkett, as she was a federal employee applying for federal government positions.  For these reasons, the Court grants summary judgment as to Ms. Burkett's § 1983 claim.

*  *  *

For these reasons, Mr. Vilsack's motion for summary judgment is granted.  Ms. Burkett's race discrimination, retaliation, and 42 U.S.C. § 1983 claims are hereby dismissed with prejudice.

SO ORDERED this 26th day of September, 2013.

_____
KRISTINE G. BAKER
UNITED STATES DISTRICT JUDGE